JMM:SK
F.#2013R00948

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D N Y

★   MAY 01 2015   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - --X

IN THE MATTER OF THE SEARCH OF:

THE PREMISES KNOWN AND
DESCRIBED AS AN APPLE iPHONE 4S,
MODEL NO. MC918LL/A, SERIAL NO.
DNPH7469DT9V

- - - - - - - - - - - - - - --X

EASTERN DISTRICT OF NEW YORK, SS:

A F F I D A V I T   I N
S U P P O R T   O F   A
S E A R C H   W A R R A N T

(T. 18, U.S.C., §§ 1343, 1349, 1956(h))

# MJ - 15   0405

MATTHEW GALIOTO, being duly sworn, deposes and states that he is a

Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to

law and acting as such.

Upon information and belief, there is probable cause to believe that there is

located in THE PREMISES KNOWN AND DESCRIBED AS AN APPLE iPHONE 4S,

MODEL NO. MC918LL/A, SERIAL NO. DNPH7469DT9V (the "DEVICE"), further

described in Attachment A, the things described in Attachment B, which constitute evidence,

fruits, and instrumentalities of wire fraud, in violation of Title 18, United States Code, Section

1343, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section

1349, and conspiracy to commit money laundering, in violation of Title 18, United States

Code, Section 1956(h).

1

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.     I am a special agent with the Federal Bureau of Investigation ("FBI") and have been so employed since approximately November 1995.  Since approximately October 1998, I have been assigned to a white collar crime squad on Long Island, New York. As a special agent on a white collar crime squad, my duties and responsibilities include conducting investigations of individuals and business entities that have allegedly violated federal criminal laws of the United States, including Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (mail/wire fraud conspiracy) and 1956(h) (money laundering conspiracy).  These investigations are conducted both in an undercover and overt capacity.  I have participated in investigations involving search warrants and arrest warrants.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.  During my career as a special agent investigating white collar crimes, I have participated in the execution of dozens of search warrants for evidence of financial crimes.

2.     I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from a variety of sources, including: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, (c) information obtained from confidential sources of information, (d) interviews of witnesses and victims and (e) my review of

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

documents, including financial records, analyses of financial records, email and text message communications, and business records.

BACKGROUND

The Scheme to Defraud

        3.    Based on my training and experience and the facts as set forth below, I believe there is probable cause to conclude that, between 2002 and 2013, Phillip A. Kenner and Tommy C. Constantine devised and executed a scheme to fraudulently induce several investors to invest money with entities and to deposit money into bank accounts that Kenner and Constantine controlled by falsely stating that the funds would be invested in real estate, small, privately held companies and a legal defense fund for the benefit of the investors, when, in fact, Kenner and Constantine intended to improperly divert a substantial portion of the funds to bank accounts they controlled and used the funds for their personal benefit, for unrelated business ventures and to conceal their fraudulent scheme. Based on my review of financial records and analyses of the financial records in this case, I believe the total losses to the victims due to Kenner and Constantine's fraudulent scheme are in excess of $15 million.

        4.    Between 2002 and 2013, Kenner was a financial advisor to several former and current professional hockey players (hereinafter, "the hockey player clients"), who are identified as John Doe 1 through John Doe 13 in the original indictment. In his role as financial advisor, Kenner recommended to his hockey player clients investments in real property and small, privately held businesses. One of the real estate ventures Kenner persuaded his hockey player clients to invest in was the acquisition of several parcels of land on the Big Island of Hawaii ("the Hawaii project"). Kenner represented to his hockey player clients that the goal of these investments was to develop the acquired land parcels for housing

3

and recreational use and later sell the developed parcels for a significant profit, which would, in turn, result in a significant monetary return for each investor.   Based on Kenner's representations, the hockey player clients and other investors, including John Doe 14, a resident of the Eastern District of New York, and Jane Doe 1, wired large sums of money to bank accounts controlled by Kenner for the Hawaii project.

5.     As a further part of the fraudulent scheme, Kenner persuaded several of his hockey player clients to each establish lines of credit at Northern Trust Bank and to transfer bonds and other equity held in their names to Northern Trust Bank to secure each line of credit. Kenner made a variety of misrepresentations to his hockey player clients regarding the purpose of each line of credit.   He falsely told some of his hockey player clients that the line of credit would not be drawn upon and would serve solely as collateral for the Hawaii project.   He told other hockey player clients that he would only access the line of credit with his client's permission, that the money would be used exclusively for the Hawaii project and that Kenner would be responsible for any and all payments due on the line of credit.   Kenner assured his hockey player clients that the collateral securing each line of credit would never be touched. To some of his hockey player clients, Kenner falsely represented that he, too, had pledged collateral to Northern Trust Bank to secure a line of credit.   To prevent his hockey player clients from learning the balance of their lines of credit on a month-to-month basis, Kenner arranged to have Northern Trust Bank mail the statements for each of the lines of credit only to KENNER, at his home in Arizona.

6.     Without his hockey player clients' knowledge or permission, Kenner used the lines of credit to, among other things, purchase land parcels for himself in Hawaii, to purchase an interest in a piece of land in the Eastern District of New York and to make interest

4

payments on the lines of credit. Kenner also diverted money from the lines of credit, as well as the hockey players' initial $100,000.00 cash investment, to bank accounts controlled by Kenner and Constantine for uses unrelated to the Hawaii project, including to pay personal mortgages, credit card bills and other personal expenses. Financial records reveal that, between December 2004 and March 2006, KENNER, through a series of wire transfers, directed approximately $2 million from the Hawaii project to CONSTANTINE's holding company, Constantine Management Group, LTD ("CMG"). CMG had no relation to the Hawaii properties during that time. CONSTANTINE transferred the money to other corporate accounts he controlled, as well as to two race car teams in California. CONSTANTINE also used the money to make payments on personal mortgages and to pay for meals, limousines, rental cars, and cellular telephone expenses.

7. In August 2006, Lehman Brothers ("Lehman") agreed to finance the Hawaii project up to approximately $100 million. At KENNER's direction, Lehman made an immediate $6.9 million payment to Urban Expansion, a company controlled by CONSTANTINE and another individual. The $6.9 million was repayment for a $3.5 million loan in October 2005 from Urban Expansion to a holding company controlled by KENNER so that the Hawaii project could close on a piece of property on the Big Island.[2] Of the $6.9 million repayment to Urban Expansion, $2 million was a pre-payment penalty, which Lehman advised KENNER could be avoided by not paying off the entire loan. However, KENNER insisted that the loan to Urban Expansion be paid back in full, to the detriment of his investors.

---

[2] It should be noted that the $3.5 million actually came out of the bank account of Intrigue Investments, which CONSTANTINE did not control or operate, as Urban Expansion was a shell company created just days prior to the $3.5 million loan and had no bank account at the time.

Lehman agreed to do so, but included a provision in the settlement agreement, which KENNER signed, that explicitly stated that KENNER was not to directly or indirectly receive any portion of the $6.9 million of the Lehman funds that was being used to pay off the Urban Expansion loan. After Lehman paid Urban Expansion $6.9 million, just over $2 million was transferred to an account for CMG, controlled by CONSTANTINE. Days later, CONSTANTINE transferred $669,000 to accounts controlled by, or for the benefit of, KENNER, notwithstanding the prohibition in the settlement agreement with Lehman. CONSTANTINE used his portion of the pre-payment penalty money to pay personal mortgages and loans, to make car payments, and to pay for airfare, hotels, car rentals, jewelry and cellular telephone expenses. In addition, CONSTANTINE transferred $150,000 to two car racing teams and over $150,000 to other corporate accounts he controlled. CONSTANTINE wired $17,000 to Unique Auto Sports, in the EDNY. By November 2006, CONSTANTINE had depleted the $2 million that was transferred into his CMG account from Urban Expansion in August 2006.

        8.     In early 2009, Kenner failed to make interest payments on the lines of credit and, as a result, in late March 2009, Northern Trust Bank closed the lines of credit and liquidated the equity securing each line of credit. John Does 1 through 8 lost a total of approximately $9 million due to KENNER's use of their lines of credit. Most of the parcels of land acquired for the Hawaii project have been sold at foreclosure auctions or remain in foreclosure.

        9.     In addition to the Hawaii project, Kenner persuaded several of his hockey player clients to invest in Eufora LLC ("Eufora"), a company founded by Constantine in or about 2002 that sold prepaid debit cards. Between approximately February 2008 and

6

December 2009, Kenner and Constantine convinced several of Kenner's hockey player clients, as well as John Doe 15, a resident of the Eastern District of New York, to collectively invest over $1.5 million in Eufora.   Financial records and analysis revealed that Kenner and Constantine diverted most of the $1.5 million to bank accounts they or another co-conspirator controlled, and used the money for purposes unrelated to Eufora, including to pay personal mortgages, make automobile and credit card payments, and to pay for hotels, airplane tickets, meals and jewelry.

           10.     In or about the Spring of 2009, Kenner and Constantine met with several of Kenner's hockey player clients to persuade them to contribute to a legal defense fund known as the Global Settlement Fund ("GSF").   According to Kenner and Constantine, the GSF would be used primarily to litigate civil claims in connection with the hockey players' investments in real estate projects in Mexico, which Kenner and Constantine claimed were at a standstill because the developer of those projects, John Doe 17, had misused the investors' money.   Kenner's hockey player clients contributed a total of approximately $4.1 million to the GSF.   Kenner and Constantine directed the hockey player clients to wire their contributions to the escrow account of John Doe 16, an attorney in Los Angeles, California, whom Kenner and Constantine stated would represent them in the civil action against John Doe 17.

           11.     Financial records and analysis revealed that only a small fraction of the $4.1 million contributed by Kenner's hockey player clients to the GSF was used for legal proceedings against John Doe 17.   The majority of the GSF money was transferred into bank accounts controlled by Constantine.   Kenner and Constantine used significant portions of the money for purposes unrelated to the Mexico litigation or the other purported purposes of the

GSF, including to pay attorneys' fees in a legal matter involving a race car company that Constantine owned, for Kenner to invest in a tequila company in Mexico, and to arrange for an associate of Constantine to purchase Constantine's home in Arizona, which was going into foreclosure. Financial records show that Kenner and Constantine often transferred money they obtained from Kenner's clients through various bank accounts – sometimes on the same day. Based on my training and experience and my knowledge of this investigation, I believe Kenner and Constantine did so in an effort to disguise, among other things, the source of the funds and who controlled the funds.

12.     Kenner also defrauded John Doe 1 and John Doe 2 in order to acquire an ownership interest in a parcel of land in Sag Harbor on Long Island, New York ("the Sag Harbor property"). In October 2006, Kenner represented to John Doe 1 that John Doe 1 could acquire a 50% interest in the Sag Harbor property by investing $375,000.00, which John Doe 1 wired to a bank account Kenner controlled. In addition to the $375,000.00 invested by John Doe 1, Kenner withdrew $395,000.00 from John Doe 2's line of credit, without John Doe 2's knowledge or permission, to purchase the Sag Harbor property. Kenner created the Led Better Development Company, LLC ("Led Better") to purchase the Sag Harbor property. After Led Better purchased the Sag Harbor property, Kenner instructed John Doe 14 and John Doe 18 to each wire $190,000.00 to him, which they did, to obtain a 25% interest each in the Sag Harbor property.

13.     The Led Better operating agreement, which Kenner drafted, but did not disclose to John Does 1, 2, 14 or 18, stated that Kenner, John Doe 1, John Doe 14 and John Doe 18 each owned 25% of Led Better, which owned the Sag Harbor property. Thus, Kenner acquired a 25% interest in the Sag Harbor property without using any of his own money. In

8

addition to the 25% interest in the Sag Harbor property, Kenner obtained approximately

$380,000.00 as part of the fraudulent scheme.   While John Doe 1 believed, based on Kenner's

representations, that he owned 50% of the Sag Harbor property, the Led Better operating

agreement provided that John Doe 1 owned only 25% of the Sag Harbor property.   To conceal

his fraudulent scheme and to prevent John Doe 2 from learning that Kenner had used

$395,0000.00 to purchase property on Long Island for himself, Kenner continued to make

interest payments on John Doe 2's line of credit until early 2009 and ensured that John Doe 2

did not receive monthly statements on his line of credit.

14.     In or about March 2010, John Doe 14 learned that Kenner had failed to

pay the property taxes on the Sag Harbor property and that there was a lien on the property.   It

was during this same approximate time period that John Doe 14 and John Doe 18 learned that

John Doe 1 was also a part owner of the Sag Harbor property.   Moreover, it was during this

approximate time period that John Does 1, 14 and 18 realized that Kenner did not invest any of

his own money to purchase the Sag Harbor property, yet claimed to own 25% of the Sag

Harbor property.

15.     Kenner eventually paid the property taxes in or about May 2010, by

using money he obtained from John Doe 12 as a loan for a home renovation project in Paradise

Valley, Arizona.   In approximately May 2012, John Does 1, 14 and 18 sold the Sag Harbor

property at a loss.   In or about April 2013, Kenner sued John Doe 14 in connection with the

Sag Harbor property.   That lawsuit remains pending in Arizona state court.

16.     On October 29, 2013, a grand jury sitting in the Eastern District of New

York returned an indictment charging Kenner and Constantine with wire fraud (18 U.S.C.

§ 1343), conspiring to commit wire fraud (18 U.S.C. § 1349), and conspiring to commit

9

money laundering (18 U.S.C. § 1956(h)).  See United States v. Kenner, 13-CR-607 (JFB) (ECF No. 1).[3]  Based on the foregoing indictment, the Honorable Arlene R. Lindsay, United States Magistrate Judge for the Eastern District of New York, authorized arrest warrants for Kenner and Constantine.  On or about November 13, 2013, Kenner and Constantine were placed under arrest.  At the time of his arrest, Kenner had the DEVICE in his possession.

Use of Telephone

17.    Evidence gathered during this investigation reveals that Kenner frequently used his cellular telephone to communicate via text message with co-conspirators, including CONSTANTINE and another individual identified as "Co-Conspirator 1."  Based on information provided by victims and associates in this investigation, KENNER also communicated with them via text message.

18.    By way of example, on April 24, 2008, at approximately 8:10 a.m., KENNER sent the following test message to CONSTANTINE: "I'm sending CMG [a company controlled by Constantine] $100k today.  Please send the extra $25k back to me.  Thx…"  Based on my knowledge of this investigation, including my review of bank records, the $100,000 that KENNER referred to in the text message was a $100,000 investment in Eufora made by John Doe 13 on or about April 24, 2008.  At 8:55 a.m., CONSTANTINE responded via text message: "$25k?  I need $40k for Lawyers and $40k for GT car.  Is that eufora $?" KENNER responded "Yes".  CONSTANTINE replied via text message: "Are you cool if I just send the $17k? Im sorry to nickel and dime you but I have to lay out 80 straight

---

[3] More recently, on February 26, 2015, a grand jury in the Eastern District of New York returned a superseding indictment containing nine of the ten previous charges.  See United States v. Kenner, 13-CR-607 (JFB) (ECF No. 172).

away and I dont even have enough to get to the meeting in Cabo." KENNER responded "No problem."

19. KENNER attached a copy of the above text message and several others as exhibits to a Complaint he filed in the United States Bankruptcy Court in the District of Arizona, in connection with CONSTANTINE's bankruptcy petition. See Case No. 12-BK-04842-EWH.

20. In September 2012, KENNER and victim John Doe 2 engaged in a series of text message communications. At approximately 11:47 a.m., KENNER sent John Doe 2 a text message with a photograph of an airplane and wrote: "Constantine's new plane. How does this make you feel?" John Doe 2 responded: "how should we feel... the guy U brought into our lives and is spending our money is our fault . . . or is it Tommys fault AGAIN . . . that we haven't gotten [John Doe 17] arrested let C . . . . . how does the order go Im getting confused . . . [John Doe 8's] fault . . . [female's] fault . . . [John Doe 17's] fault . . . [John Doe 14's] fault . . . . [John Doe 1's] fault . . . [John Doe 17's] fault . . . back 2 Tommy now . . . O Ya forgot about [John Doe 9] and [another former hockey player] in there to." John Doe 2 provided copies of the above-described text messages to the government.

21. In January 2013, KENNER sent a text message to Co-Conspirator 1. By way of background, in early 2009, Co-Conspirator 1 allowed KENNER to transfer $700,000 of hockey player investments in Eufora through Co-Conspirator 1's account. Co-Conspirator 1 transferred most of the money out of his account to accounts controlled by KENNER and to other accounts, as directed by KENNER. On January 8, 2013, KENNER wrote to Co-Conspirator 1 via text message: "You know where I am!! I am talking to the FBI tomorrow about a threat [John Doe 1] sent me. Also, I am less than 2 weeks away from filing

my nasty lawsuit against Gentry and his Co.   Stupidity and greed are going to sink him! It's like watching Constantine all over again. I'm shocked!!"

22.     Also, on January 8, 2013, KENNER sent a text message to John Doe 14's brother, a resident of the Eastern District of New York.   John Doe 14's brother worked on KENNER's home in Arizona between approximately 2010 and early 2012, and KENNER owes him money.   KENNER has accused John Doe 14's brother of having stolen KENNER's tools.   The text message from KENNER states: "Good.   Please have them [the tools] in AZ by the end of January, so you can stay out of the business with your brother.   He already got you into some trouble, but hopefully, there won't be any more.   Pk"

23.     John Doe 14's brother has advised me that he engaged in a further series of text message with KENNER in August 2013 concerning the tools and the money KENNER owes John Doe 14's brother.   John Doe 14's brother has also shown me these text messages.

24.     From October 27, 2013 to November 12, 2013, the day before his arrest, KENNER sent text messages to another individual, Constantine's partner in Urban Expansion, about pursuing legal and other actions against John Doe 17 and referencing deals in Hawaii and Mexico.

25.     In or about August 2010, KENNER sent John Doe 14 an audio recording of himself and CONSTANTINE having a discussion at Home Depot (the "Home Depot recording").   During the discussion, KENNER and CONSTANTINE discuss various aspects of the fraudulent scheme including the diversion of investor funds intended for Eufora to Kenner's personal benefit.   Based on statements made by KENNER's attorney on April 28, 2015, there is probable cause to believe that Kenner created the Home Depot recording using the DEVICE.

12

33.     Based on my training and experience and discussions with other law enforcement officers, as well as the facts of this investigation, I know that individuals involved in conspiring to commit wire fraud and conspiring to commit money laundering often do not act alone and often communicate with victims and coconspirators by means of cellular telephones such as the DEVICE.   They commonly maintain records that reflect names, addresses, or telephone numbers of their victims and associates in their cellular telephones. They also commonly maintain records of communications such as call logs, chats, text messages and WhatsApp messages in their cellular telephones.   They also commonly take photographs of themselves, their associates, or their property using their cellular telephones. These individuals usually maintain these records of communication and photographs in their possession and in their cellular telephones.

34.     Based on my knowledge, training, and experience, I know that the DEVICE can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the DEVICE.   This information can sometimes be recovered with forensic tools.

35.     Upon Kenner's arrest, law enforcement officers seized the DEVICE. Since its seizure, the DEVICE has been in law enforcement custody.

36.     Thus, I respectfully submit that there is probable cause to believe that KENNER continued to use his cellular telephone, the DEVICE, up until the time of its seizure incident to arrest, to send text messages, emails, and otherwise.   There is further probable cause to believe that the DEVICE contains names and contact information for Kenner's co-conspirators, witnesses and victims, along with text messages and emails concerning KENNER and CONSTANTINE'S scheme to defraud KENNER's hockey player clients, as

well as other investors.   There is therefore probable cause to believe that the DEVICE

contains evidence, fruits, and instrumentalities of federal crimes.

TECHNICAL TERMS

37.     Wireless telephone (or mobile or cellular telephone):   A handheld

wireless device used for voice and data communication through radio signals.   These

telephones send signals through networks of transmitter/receivers, enabling communication

with other wireless telephones or traditional "land line" telephones.   A wireless telephone

usually contains a "call log," which records the telephone number, date, and time of calls made

to and from the phone.   In addition to enabling voice communications, wireless telephones

offer a broad range of capabilities.   These capabilities include: storing names and phone

numbers in electronic "address books;" sending, receiving and storing text messages and

email; taking, sending, receiving and storing still photographs and video; storing and playing

back audio files; storing dates, appointments, and other information on personal calendars; and

accessing and downloading information from the Internet.   Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the

device, and a wide variety of applications, also known as "apps," which may store the user's

preferences and other data.   Such apps may include Facebook, Twitter, WhatsApp and other

social media services.   WhatsApp is a cross-platform mobile messaging application which

allows users to exchange written messages between smartphones over a network, and included

messages can contain image, video and sound content.

38.     IP Address:   An Internet Protocol address (or simply "IP address") is a

unique numeric address used by computers on the Internet.   An IP address is a series of four

numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).   Every

14

computer or other electronic device, such as the DEVICE, that connects to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term- IP addresses, while other computers have dynamic - that is, frequently changed - IP addresses.

39. Based on my research, I know that the DEVICE provides not only phone and text message services, but can also be used to send and receive emails; access the Internet; track GPS data; take, store and share photographs and videos; and use a wide variety of apps, such as Facebook, Twitter, WhatsApp and many others. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the DEVICE.

## TECHNICAL BACKGROUND

40. As further described in Attachment B, this application seeks permission to locate not only data that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence can be recovered from the DEVICE because:

a. Data on an electronic device can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the device that show what tasks and processes were recently active. Web browsers, email programs, and instant messaging/"chat" programs store configuration information on the device that can reveal information such as

15

online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the device was in use.   Electronic devices can record information about the dates files were created and the sequence in which they were created.

     b.  Forensic evidence on an electronic device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, registry information, configuration files, user profiles, email, email address books, instant messaging or chat logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the electronic device at a relevant time.

     c.  A person with appropriate familiarity with how an electronic device works can, after examining this forensic evidence in its proper context, draw conclusions about how devices were used, the purpose of their use, who used them, and when.

     d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic device that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, such evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding user attribution evidence, sometimes it is necessary to establish that a particular thing is not present on an electronic device.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.    I know that when an individual uses an electronic device to commit wire fraud, conspire to commit wire fraud, or conspire to commit money laundering, the individual's electronic device may generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.   The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The electronic device is also likely to be a storage medium for evidence of crime.   From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

41.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42.    Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve intrusion into a

physical location.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43.     Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that on the DEVICE there exists evidence of crimes.  Accordingly, a search warrant is requested.

## AUTHORIZATION REQUEST

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS AN APPLE iPHONE 4S, MODEL NO. MC918LL/A, SERIAL NO. DNPH7469DT9V.

Dated: Central Islip, New York
        May 1, 2015

MATTHEW GALLIOTO
Special Agent, FBI

Sworn to before me this
1st day of May, 2015

/s/ Steven I. Locke

THE HONORABLE STEVEN I. LOCKE
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

19

ATTACHMENT A

Property To Be Searched

The property to be searched is AN APPLE iPHONE 4S, MODEL NO.

MC918LL/A, SERIAL NO. DNPH7469DT9V, hereinafter the "DEVICE."   This warrant

authorizes the forensic examination of the DEVICE for the purpose of identifying the

electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things To Be Seized

All information obtained from DEVICE will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing the information described below that constitutes fruits, evidence and instrumentalities of wire fraud, in violation of T. 18, U.S.C., § 1343, conspiring to commit wire fraud, in violation of T. 18, U.S.C., § 1349, and conspiring to commit money laundering, in violation of T. 18, U.S.C., § 1956(h):

1. Audio recordings on the DEVICE described in Attachment A constituting evidence, fruits or instrumentalities of wire fraud, in violation of Title 18, United States Code, Section 1343, conspiring to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and conspiring to commit money laundering, in violation of Title 18, United States Code, 1956(h);

2. Text messages on the DEVICE described in Attachment A, constituting evidence, fruits or instrumentalities of wire fraud, in violation of Title 18, United States Code, Section 1343, conspiring to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and conspiring to commit money laundering, in violation of Title 18, United States Code, 1956(h); and

3. Evidence of user attribution showing who used or owned the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history.